UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. James B. Clark III |
| v. | : | Mag. No. 18-3335 |
| RICHARD BISHARA<br>a/k/a "Rashad Bishara" | : | **CRIMINAL COMPLAINT** |

I, Special Agent Brent Talaga, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

Continued on the attached page and made a part hereof:

Brent Talaga, Special Agent
U.S. Department of Homeland Security,
Homeland Security Investigations
(Agent Talaga attested to this Complaint
by telephone pursuant to FRCP
4.1(b)(2)(A))

Sworn to and subscribed via telephone this
5th day of December, 2018, in New Jersey

HONORABLE JAMES B. CLARK III
UNITED STATES MAGISTRATE JUDGE

1

## **ATTACHMENT A**

### **Conspiracy to Commit Wire Fraud**

From in or around May 2010 through in or around February 2015, in the District of New Jersey and elsewhere, the defendant,

RICHARD BISHARA,
a/k/a "Rashad Bishara,"

did knowingly and intentionally conspire and agree with others known and unknown, to devise a scheme and artifice to defraud, and to obtain money and property from the victims by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice would affect financial institutions, and for the purpose of executing such scheme and artifice, did knowingly and intentionally transmit and caused to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals, pictures, and sounds, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

## ATTACHMENT B

I, Brent Talaga, am a Special Agent, with the United States Department of Homeland Security, Homeland Security Investigations. I have knowledge of the following facts based upon both my investigation and discussions with other law enforcement personnel and others. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of a complaint, I have not set forth each and every fact that I know concerning this investigation. Where statements of others are related herein, they are related in substance and part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### The Conspiracy

1. The object of the conspiracy was for defendant Richard Bishara, a/k/a "Rashad Bishara" ("Bishara"), and co-conspirators to enrich themselves by creating a number of moving companies (collectively, "the Target Companies"). The investigation, based upon witness interviews, search warrants, recorded telephone calls, surveillance, and forensic examinations of electronic devices, has shown that Bishara was the owner and manager for many of the Target Companies.

2. The co-conspirators operated the Target Companies by quoting customers "low-ball" price estimates for household goods moves and then raising prices on the date of the move after the goods were loaded and the customers were in vulnerable positions. That is, the Target Companies consistently, over a number of years and hundreds of moves, raised final prices for moves above the allowed increase from initial estimates as provided by federal regulations.

### Moving Fraud Scheme

3. The federal regulations governing moving companies are set forth in 49 C.F.R. § 375. As relevant here, after a customer contacts a moving company, the company provides the customer with a "non-binding estimate" of moving cost pursuant to a telephonic or visual inventory of the goods to be moved. A non-binding estimate is not binding as the final charges are based upon the actual weight or volume of the shipment, the services provided, and the tariff provisions in effect. However, the final price may not be increased to more than ten percent above the initial estimate. 49 CFR § 375.703(b).

4. The co-conspirators concealed the overarching scheme by creating the various Target Companies—often registering them through fictitious owners and listing fictitious headquarters addresses—to avoid detection by law enforcement. Once customers began to make complaints against one of the Target Companies, that particular company was shut down, and the co-

3

conspirators then transformed the company they were using into another moving company.

5. The Target Companies were located in Clifton, New Jersey, and, later, in Moonachie, New Jersey ("the Moonachie office"). The co-conspirators jointly controlled and operated the Target Companies, despite the fact that they were separate legal entities. The Target Companies shared bank accounts, P.O. Boxes, employees, and the Moonachie office.

6. In furtherance of the scheme, a representative from one of the Target Companies would contact the customer and provide a "low-ball" estimate based on a telephonic inventory of the household goods conducted by the victim and the representative. The Target Companies would then email a moving estimate to the victim and request that the victim email back a signed estimate. In many instances, the victim would pay a deposit for the move via credit card.

7. During the telephonic inventory process, the Target Companies gathered as much information from their potential victims as possible. For example, the Target Companies would determine the exact time and date the victim was scheduled to leave their residence, travel, have cleaning services performed, or have utilities turned off. The Target Companies would then use that information against the victim and purposefully delay the move in order to cause additional stress or preclude the victims from seeking another moving alternative within their budget and moving timeline.

8. During the agreed-upon move date range or after the date range had passed, employees of the Target Companies would arrive at the victims' residences and begin packing and loading the household goods. At various points in the loading process and often times after the household goods were completely loaded, representatives of the Target Companies would explain to the victim in person or over the telephone that there were more household goods than previously estimated and, therefore, a significant amount of additional money was due. This amount of money, which was in some cases twice the amount of the estimate or more, was demanded by the Target Companies to be paid in cash, postal money order or cashier's check before they would deliver the household goods to the victim, in violation of the ten percent price-increase restriction outlined in 49 CFR § 375.703(b).

9. If the victim refused to pay the increased price, representatives of the Target Companies would threaten to keep the victim's household goods in storage, sometimes with fees, until the total payment was made—essentially holding the household goods hostage. Alternatively, the Target Companies' representatives and victim would argue until agreeing on a price that was lower than the increased price, yet still much higher than the original estimate.

4

10. Oftentimes, once informed of the price increase, a victim would request that the representatives of the Target Companies unload the household goods and terminate the move, at which time representatives of the Target Companies would inform the victim that the household goods could not be removed for a number of reasons.

11. When a victim called to complain about price increases and other issues, co-conspirators of Bishara would generally field the calls. The co-conspirators would oftentimes keep the victim on hold for significant periods of time, disconnect the victim's call, argue with the victim, and/or transfer the victim's call to a manager, all in an attempt to avoid the victim's complaint.

12. Law enforcement observed Bishara entering and exiting the Moonachie office during business hours on numerous days in 2014.

13. During a search of the Moonachie office, and pursuant to a valid search warrant, law enforcement found a spreadsheet detailing several years of moves by the Target Companies on a co-conspirator's computer. For the years 2013 through a portion of 2015, the Target Companies handled approximately 1,514 moves, and, of those moves, approximately 88 percent, or 1,338 moves, involved final costs that were above the permissible 10 percent increase of the estimates. In at least one case, the estimate was increased on the day of the move as high as 400 percent. The difference between the many estimates and final balances for the victims' moves was approximately $2 million.

14. The Moonachie headquarters contained four, single occupant offices. Law enforcement identified Bishara's office among the four, based upon employee interviews the day of the search warrant, documents—including copies of Bishara's driver's license and tax information—found in the office, and an examination of hard drives recovered from office. At least one hard drive recovered in Bishara's office contained a spreadsheet of bank account login passwords—for accounts associated with the Target Companies—which used variations of Bishara's first and last name. That file was stored on the hard drive under user "Richie."

15. Spreadsheets recovered from multiple computers in the Moonachie office, as well as in hard copy in Bishara's office, which documented moves, revenues, and foreman activity across the Target Companies, listed Bishara as the owner of numerous of the Target Companies.

16. During the course of the conspiracy, the co-conspirators, including Bishara, executed a scheme to obtain money from the victims by means of materially false and fraudulent pretenses, representations, and for the purpose of executing such scheme, did knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate commerce,

certain writings, signs, signals, pictures, and sounds, including credit card payments, check payments, emails, and telephone calls.